**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


**UNITED STATES OF AMERICA**      )

           **v.**          )        **CR. NO. 23-102 (CRC)**

**ELEANOR HOPPE**          )

_____ )


## MEMORANDUM IN AID OF SENTENCING




"Each of us is more than the worst thing we've ever done."

*Bryan Stevenson – Just Mercy: A Story of Justice and Redemption*


1

Eleanor Hoppe's life unfolded like a Norman Rockwell painting depicting an idyllic American life. Raised in an upper-middle class home in the serene suburbs of Richmond, Virginia with two devoted parents and a doting younger brother, her life was nostalgic. She attended elite elementary and middle schools and a prestigious boarding school for a year. Summers were spent in the rolling green hills of Shenandoah Valley. She rode horses and ran cross-country track. She graduated from the University of Virginia and met her college sweetheart. She stopped short of going to law school like her brother and father. But it did not stop her from being immersed in the legal circles, because her college sweetheart became an attorney, and she worked in the legal field as a paralegal. She had a lovely family life, with her husband and two daughters, raising them in a close-knit family, as a self-described regular "soccer mom." Even in the shadows of an early diagnosis of depression and brief excursions into marriage counseling, all still normal for most, her life was picturesque.

A year into her marriage, multiple sclerosis (MS) began eating away at her body. The once cross-country runner began experiencing scoliosis, fatigue, numbness and tingling in her extremities, and difficulty with balance, falling from time to time. MS is a complex incurable disease affecting the central nervous system. From 2013 onward, she had further medical complications. She was diagnosed with "restless leg syndrome,"[i] ███████████████

███████████████████████████████████

████████████████████████████████

████████████████████ ███████████ ██████████

███████████████ █ In 2019, ████████████████████

██████████ █

These medical conditions took a considerable toll on her and on her marriage. But the

medication she received from restless leg syndrome (RLS) forever changed her behavior in irreparable ways.  RLS is a neurological disorder causing an irresistible urge to move the legs which interferes with sleep.  To treat RLS, in 2019, she was prescribed Mirapex (pramipexole), a dopamine agonist, commonly used to treat RLS and Parkinson's disease.  Mirapex unleashes a torrent of adverse effects that "include hypersexuality, shift in sexual interests, pathological gambling, compulsive shopping, and binge eating."[xii]  "[M]ost particularly, pramipexole is known to cause hypersexual and compulsive and obsessive, and often perverse, drives and behaviors as an unintended adverse drug effect."[xiii]  The adverse effects are unpredictable, and leaves patients at the mercy of chance.

Hypersexuality unleashed its toll on Eleanor Hoppe, shattering her already impaired perfect life.  She began experiencing uncontrollable sexual impulsivity.  She began visiting chat rooms dedicated to sexual fetishes.  She engaged in sexual behavior that she had never been interested in before.  She reported these side effects to Dr. Paul Spector her long-time doctor, who prescribed her Mirapex.   Dr. Spector began treating her for physical and psychiatric symptoms since 1995.  At some point, ███████████████████████████████████ ████████████████████████████████████████████████████████.

Her husband could not understand what happened to her.  The doctors had concluded that Mirapex was causing her impulsivity and uncharacteristic behavior.  They recommended that she be taken off Mirapex and was released to the care of Dr. Spector.  After discontinuing Mirapex, she returned to pre-Mirapex behavior.  Dr. Spector prescribed another medication to treat RLS, but he had to keep increasing the dose because it was not as effective as Mirapex.  At some point, Dr. Spector re-prescribed Mirapex and Ms. Hope began experiencing sexual impulsivity again, this time on an extremely compulsive level.

As stated above, Mirapex, used to treat RLS and Parkinson's disease, causes hypersexuality at a pathological level.

> Pathologic hypersexuality has occasionally been reported in patients with Parkinson's disease (PD), linked to medications. Pathologic hypersexuality has been defined [as]: '**The need for sexual behavior consumes so much money, time, concentration, and energy that the patient describes himself as out of control; intrusive unwanted paraphiliac thoughts prevent concentration on other life demands and are the source of anxiety;** and orgasm does not produce satiety in the way it typically does for age mates' [xiv]

After being prescribed it again, Ms. Hoppe had been taking Mirapex for approximately four months prior to her arrest in this case. In addition to Mirapex, Ms. Hoppe was on medication used to treat mental health and physical conditions such as depression, anxiety, ADHD, and severe muscle spasms.

For many decades, federal courts were allowed to apply a form of the insanity defense that explained to a jury that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct [i.e. cognitive test] or **to conform his conduct to the requirements of [the] law** [i.e. volitional test]."[xv]  In in 1929, the D.C. Circuit embraced the defense of irresistible impulse due to the science:

> The modern doctrine is that **the degree of insanity which will relieve the accused of the consequences of a criminal act must be such as to create in his mind an uncontrollable impulse to commit the offense charged. This impulse must be such as to override the reason and judgment and obliterate the sense of right and wrong to the extent that the accused is deprived of the power to choose between right and wrong**… The accepted rule in this day and age, with the great advancement in medical science as an enlightening influence on this subject, is that the accused must be capable, not only of distinguishing between right and wrong, but that he was not impelled to do the act by an irresistible impulse, which means before it will justify a verdict of acquittal that **his reasoning powers were so far dethroned by his diseased mental condition as to deprive him of the will power to resist the insane impulse to perpetrate the deed, though knowing it to be wrong.**[xvi]

Despite the decades of federal courts recognizing the defense of one's inability to control or conform his or her conduct to the law as a result of a mental defect, Congress eliminated this volitional part of the insanity defense in 1984, when it passed the Insanity Defense Reform Act of 1984, codified at 18 U.S.C. § 17.   Congress changed the law in response to the John Hinckley insanity ruling.  "The insanity ruling that sent President Ronald Reagan's would-be assassin, John Hinckley Jr., to a government psychiatric hospital rather than prison was handed down 34 years ago, but its repercussions still affect hundreds, if not thousands, of people who commit a crime and also have mental illness."[xvii]  With this change, judges and juries were barred from hearing the irresistible impulse aspect of the insanity defense.

After being off of Mirapex, Ms. Hoppe's behavior has returned to normal.  She has not been diagnosed with pedophilic disorder and does not require intensive sex offender treatment. While incarcerated pending sentencing, she has accumulated numerous certificates, served on the debate team, and served as a mentor to others.  Her family and friends speak of her high morals, hard-working loving character as a mother and strength through her MS challenges.  Not only is this case rare, but this conduct is an aberration for a woman, who has no criminal history, has never been arrested, and has never abused others.  Based on the nature and circumstances of the offense, Ms. Hoppe's background, her acceptance of responsibility, the current state of the law, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense requests that this Honorable Court accept her binding plea to 135 months.

## Sentencing Law

The era of binding guidelines ended in 2005, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively **advisory.**"[1]  Under

---

[1] *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added)

*Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."[2]   While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Overall, in light of *Booker*, courts must treat the Guidelines as <u>one</u> among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar

---

[2] *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).

records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'"[3] to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation."[4]  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.[5]

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.**[6]

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "**sufficient, but not greater than necessary**, to comply with the purposes [of sentencing]."[7]

---

[3] *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)).
[4] *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).
[5] 18 U.S.C. § 3661.
[6] 18 U.S.C. § 3582(a) (emphasis added).
[7] *Id*. § 3553(a) (emphasis added).

**Argument**

For the following reasons, the agreed upon sentence is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

## I.    The Nature and Circumstances of the Offense

The nature of the offense is serious as set forth in the Statement of Offense.

The circumstances leading up to her arrest are notable here.  Prior to being arrested, Ms. Hoppe was taking large doses of Mirapex (pramipexole), amounts prescribed by her doctor, to treat RLS.  Her doctor had doubled Mirapex, even though she complained of hypersexuality and manic behavior.[8]  By February 2023, she lost her job at a law firm "due to erratic behavior and found [her]self compulsively spending hours daily online in explicit sex chat rooms. During this three-week period, [she] adopted different hypersexual personas to fit different bizarre conversations that became increasingly extreme and dangerous."

As stated above, Mirapex is well-known to cause compulsive behaviors and hypersexuality.  Some cases have similar compulsive behaviors as what Ms. Hoppe experienced. In one case, an individual had a "'compulsive need to view pornography,'" including child pornography.  Receiving another medication in addition to Mirapex appeared to counteract the hypersexual behavior brought on by Mirapex:

> Mr. D, a 54-year-old unemployed man, suffers from RLS. After being diagnosed with RLS, he was prescribed pramipexole 0.125 mg 3 times daily and reported improved sleep. In his opinion, "pramipexole is a miracle drug. **Mr. D was first assessed at the SBC before his trial for charges of accessing and possessing child pornography depicting girls (aged 11 to 17 years). He also had a large collection of pornography depicting women (aged 18 to 70 years). He denied ever masturbating while watching child pornography but reported having a "compulsive need to view pornography." Despite improvement in his symptoms of RLS while taking pramipexole, he also reported problematic interest in internet pornography and an emergence of "an abnormal interest**

---

[8] Eleanor Hoppe Letter, Exhibit 1.

**in teenagers and preteens."** Consequently, a medication trial with MPA [medroxyprogesterone acetate] was initiated while continuing treatment with pramipexole. He was prescribed MPA up to 400 mg daily and reported complete remission of problematic sexual urges and behaviors. The combined use of pramipexole and MPA allowed Mr. D to adequately manage his RLS and problematic sexual interests.[9]

Experts reviewing Ms. Hoppe's records noted that the drugs caused her behavior, and

that she had no compulsive behaviors prior to using Mirapex:



**expert opinion, Ms. Hoppe's offending behavior was mediated by the pharmacological effects of her prescribed medications, with her online interactions influencing how these compulsions manifested.**



**appeared out of character and likely influenced by multiple factors. Dr.**

---

[9] Lisa Murphy, Thanh Ly, Keana DiMario, Terry Mihowich, and J Paul Fedoroff, *Treatment of Pramipexole-Induced Problematic Sexual Behaviors*, Prim Care Companion CNS Disord 2021;23(0):20br02663, Feb. 18, 2021, available at https://www.psychiatrist.com/pcc/treatment-of-pramipexole-induced-problematic-sexual-behaviors/

██████████████ **Ms. Hoppe's behavior at the time of the instant offense was
not fully volitional and that medication effects made her particularly
vulnerable to the behaviors that led to her offense**.[10]

As a result of being on Mirapex in addition to her other medications, any of her normal
inhibitions or natural ability to suppress impulses were overridden. Ms. Hoppe explains her
conduct as follows: "The things I wrote and the photos that I sent put me in the middle of
scenarios that moved from a hypothetical role play to graphic descriptions of fictious situations
including taboo parenting."[11] Even though there is no doubt that dosage of Mirapex caused her
behavior (in addition to other factors addressed above), Ms. Hoppe has accepted that her actions
were wrong: "While excessive doses of Mirapex affected me in multiple ways, there is no
excuse for any of my actions. The nature of my crime is so very serious. The stipulations of my
guilty plea are overwhelming, but the nature of the crime is severe, and the facts of the instant
offense are heinous. I have accepted the consequences of my illegal activity."[12]

## II.    Ms. Hoppe's History and Characteristics

Eleanor Hoppe was born in Charlottesville, Virginia to two loving parents who provided
her with love and support, which continue to this day, despite the terrible nature of the events.
She lived an upper-class but moderate lifestyle, with home-cooked dinners, country club
gatherings, summer camp in the Shenandoah Valley, and time at boarding school. There is no
indication that Ms. Hoppe had an abusive or excessive upbringing.

She married in 2002 and had two daughters. Her marriage ended in 2019 during the time
Ms. Hoppe's behavior changed while on Mirapex. In that year, she started experiencing

---

[10] Forensic Neuropsychological Evaluation by Dr. Jonathan DeRight, Exhibit 2 at p. 8.
[11] Eleanor Hoppe Letter, Exhibit 1.
[12] Id.

uncontrollable sexual impulsivity.  PSR ¶ 64d.  In addition, her physical abilities declined and there was a confluence of her physical limitations and increased dosage of Mirapex:



In her late teens into adulthood, Ms. Hoppe was treated for ███████ by Dr. Spector.

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ ██  She "has a longstanding history of complex medical and psychiatric conditions, most notably multiple sclerosis (MS) and restless leg syndrome (RLS), both of which have required extensive pharmacological management and regular medical follow-up."[15]  ███████████████████████████

█████████████████████

    In 2019, Ms. Hoppe ████████████████████████████████████

███████████████████████████████████████████████

---

[13] Forensic Neuropsychological Evaluation by Dr. Jonathan DeRight, Exhibit 2 at p. 4.
[14] Id. at p. 6.
[15] Id. at p. 5.

████████████████████████████████████████████████████ UVA providers
linked these behaviors to dopamine agonist use, especially pramipexole." [17]



Ms. Hoppe is a very low risk for reoffending.  Dr. Katherine Robinson diagnosed her
with "Adjustment Disorder with depressed mood, related to her legal situation and recent
incarceration." [19]  "Dr. Robinson also opined that Ms. Hoppe did not meet [the] criteria for
Pedophilic Disorder, as there was no evidence of sustained sexual interest in prepubescent
children for six months or longer. No prior history suggested ongoing or prior sexual interest in
minors." [20]

While incarcerated, Ms. Hoppe has seized every opportunity to develop a new life.   One
of her most notable accomplishments has been her participation in the Department of Corrections
Debate Team.  In November 2024, Ms. Hoppe and her teammates debated the James Madison
University's debate team at the U.S. District Court on the issue of whether life without parole

---

[16] Cladribine is a drug used to treat MS. See Mayo Clinic, Cladribine (oral route)
https://www.mayoclinic.org/drugs-supplements/cladribine-oral-route/description/drg-20461358
[17] Forensic Neuropsychological Evaluation by Dr. Jonathan DeRight, Exhibit 2 at p. 6.
[18] Id.
[19] Id. at p. 9; see also Dr. Robinson's report at p. 13.
[20] Id. at p. 9; see also Dr. Robinson's report at p. 15.

sentences should be abolished. "As reported in the Washington Post, the students prevailed in a swift and unanimous 5-0 decision by a panel that included U.S. District Judges Reggie Walton, Dabney Friedrich, and Michael Nachmanoff, an Assistant Dean at Georgetown Law, and a senior Department of Justice attorney."[21]

---

[21] Letter of Support from Victoria Sheber and others, Exhibit 3.  See also Washington Post article, Exhibit 4.







In addition to having a speaking role in the debate, she also served as a co-captain the following semester, which she did not have a speaking role.  Nicknamed "Tori," her debate coaches describe her work as follows:

> In addition to her skill, Tori is a leader among her peers. She is attentive when students are struggling, she is quick to step in, and her demeanor is consistently genuine and engaging. In short, she is a joy to have in the classroom. Tori also carries a smart and kind sense of humor. During classroom moments that are otherwise tense or scatter-brained, Tori will often lighten the atmosphere with a witticism or a chuckle and bring the room back together. In the context of a class where many students are speaking in public for the first time—an intimidating task—Tori's sense of humor has lowered the stakes and encouraged others to speak with less fear and more joy. [22]

---

[22] Letter of Support from Victoria Sheber and others, Exhibit 3.  See also Washington Post article, Exhibit 4.

In addition to the debate team, Ms. Hoppe has participated in the Georgetown University Prison Scholars program. She has been described as being "a stellar student from the start" and earned a 3.9 GPA.[23] She has received dozens of certifications in a wide variety of jobs and educational training programs designed to expand the range of opportunities she can access once she returns to the community.[24] The certificates include barber school training, OSHA certification, C-Tech certification, Aramark's IN2WORK Program, ServSafe certification, and telecommunications certification.

Ms. Hoppe is love of education and commitment to others shines through in Mr. Johnson's letter of support:

> Ms. Hoppe's intelligence, warmth, and unwavering commitment to the academic and personal growth of her peers have set her apart as a beacon of hope and progress within our program. She has not only served as an outstanding tutor, but also as a cheerleader, researcher, technology assistant, advocate, and, most importantly, a trusted colleague. Her ability to connect with the women in our program and reset their attitudes toward education has been nothing less than remarkable.
>
> Throughout my tenure at the jail, Ms. Hoppe has been my primary supporter as I have worked to reimagine and revitalize the academic framework of our program. Her insights and encouragement have been the catalyst for the majority of the positive changes we have witnessed among the women in our care. The current period marks the greatest documented academic success the D.C. Department of Corrections has experienced in over a decade, and I can attest that this achievement is in no small part due to Ms. Hoppe's tireless and selfless efforts.[25]

Similarly, one of her Georgetown professors explains her love of education and her determination to make a difference using education:

> From the moment I first encountered Eleonore, her unwavering determination to turn her circumstances into catalysts for growth was nothing short of inspiring. In a world where many might easily lose hope in their struggles, Eleonore made a

---

[23] Letter of Support from Valerie Coats, Exhibit 5.
[24] Certificates and certifications, Exhibit 6.
[25] Letter of Support from Wendell Johnson, D.C. Department of Corrections, GED Instructor, Exhibit 7. See also Letter of Support from Professor Michael G. Ryan, Exhibit 8.

conscious choice to harness the transformative power of education as her pathway to healing and meaningful change.[26]

Ms. Hoppe's family and friends describe her as a "dedicated and nurturing mother" who is hard-working and who is "an accomplished woman who has been hampered in life by her disease."[27]  Her family members are her strongest advocates.  Her family's love of her and her love of them are depicted in her letter and her eloquently summarized in her poem about her father:[28]

# My Hero

By Eleanor Hoppe
September 3, 2024

My dad is my hero
He knows everything about me
My most intense moments … painful, happy
He's witnessed my dark and my light
My joy and my fright
From him I've held nothing back
And there's nothing he lacks
His love has always been my security
From my problems he will never flee
Once again: Never has he turned his back
He's convinced me there's nothing I lack
I hope and pray one day he'll know
That all I am comes from all he shows
My hero he will always be
Because he's always loved just plain me

---

[26] Letter of support from Professor Annalisa Butticci, Exhibit, 9.
[27] Letters of support from friends and family, Exhibit 10, at pp. 4 and 7.
[28] Letter of Support from Kelli Taylor and poems by Eleanor Hoppe at Exhibit 11.

### III.    The Purpose of Sentencing Will be Accomplished with the Requested Sentence.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). As stated above, courts should resist anchoring a sentence to the guideline numbers. *See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis"). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita*, 551 U.S. at 348, 350. This Court may not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). A few years ago, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. **Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020)(emphasis added).

As set forth in the PSR, the applicable Sentencing Guidelines range is 135-168 months. The parties agreed to a sentence of 135 months, which reflects the bottom of the guidelines.  See ECF No. 34 at 2.

> **A.    The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Ms. Hoppe accepts the consequences of her actions. Courts have noted that the sentencing guidelines are considerably high for offenses involving children.  *See, e.g., United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (deferring to the District Court but adding "the sentencing guidelines at issue are in our judgment harsher than necessary. . .  first-offender sentences of this duration are usually reserved for crimes of violence and the like"); *United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir.2011) ("the child pornography Guidelines are, to a large extent, not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determinations on 'empirical data and national experience,' but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines") (quoting *Kimbrough*, 552 U.S. at 109).

**B.    The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public will be protected while Ms. Hoppe serves a 135-month sentence. Ms. Hoppe's risk of recidivism is very low and does not require intensive sex offender treatment.[29]

A lengthy sentence does not have the curbing effect that many assume it does on crime. A 2017 Vera Institute of Justice analysis shows that higher incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence). **In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs**....[30]

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research

---

[29] See Dr. Robinson's report at p. 16.

[30] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (last accessed on Sept. 29, 2021) (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/ (last accessed on Sept. 29, 2021) ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). Notably, "the great majority of studies point to a null or criminogenic effect of the prison experience on subsequent offending."[31] Hence, "'[t]his reading of the evidence should, at least, caution against wild claims--at times found in "get tough" rhetoric voiced in recent decades--that prisons have special powers to scare offenders straight."[32] In short, a lengthy sentence is not needed to deter criminal conduct in this case.

### C.      The Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner." Ms. Hoppe does not need to be detained in order to obtain educational and vocational training, nor does she need a lengthy sentence to accomplish these goals. She is college-educated with a degree in Psychology. Furthermore, the Court can look to her efforts to further educate herself while detained as proof of her own efforts of rehabilitation.

---

[31] Daniel S. Nagin, Francis T. Cullen, Cheryl Lero Jonson, *Imprisonment and Reoffending*, 38 Crime & Just. 115, 178 (2009)
[32] Nagin, et al., *supra* note 35.

IV.    **The Kinds of Sentences Available and the Sentencing Guidelines Warrant a Mandatory Minimum Sentence**

As noted above, Congress demands that this offense requires only one type of sentence – imprisonment.  The sentencing guidelines require the same.  This is problematic when considering the individual characteristics of non-production child pornography offenders and their assistance.  In its most recent report, the U.S. Sentencing Commission has acknowledged that the guidelines do not have much influence in non-production child pornography reasons:

> …the guidelines exert slightly less influence on the sentences imposed for non-production child pornography cases in which judicial discretion can be meaningfully assessed than in cases in which it cannot.  **This reflects, at least in part, the policy disagreements discussed above that many courts have with the child pornography statutory and guideline sentencing scheme, as well as the fact that substantial assistance departures are much less frequent in these cases**.

*See* U.S. Sentencing Commission, *The Influence of the Guidelines on Federal Sentencing, Federal Sentencing Outcomes*, 2005-2017 (December 2020) (*available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20201214_Guidelines-Influence-Report.pdf).

As stated above, the Sentencing Guidelines are harsh.  There are enhancements for conduct that is present in a majority of cases.  In this case, like many others, the Sentencing Commission requires a 15-level enhancement for conduct that is not uncommon:

- 2-point enhancement because the material included minors under 12 years old (The "United States Sentencing Commission statistics show[] that, in 2009, '94.8% of child pornography sentences involved an image of a prepubescent minor.'" *United States v. D.M.*, 942 F. Supp. 2d 327, 343-44 (E.D.N.Y. 2013))

- 5-point enhancement because the offense involved the possession of 600 or more

images (according to the United States Sentencing Commission, 63.1% of offenses implicate this enhancement. *Id.; see also United States v. Hanson*, 561 F. Supp. 2d 1004, 1010 (E.D. Wis. 2008)("No research, study or rationale was provided for this huge increase.");

- 4-point enhancement for images showing masochistic conduct (this is present in 73.4% of cases according to the United States Sentencing Commission. *Id.*);

- 2-point enhancement for the use of a computer (according to the United States Sentencing Commission, this enhancement was applied in 95.8% of cases[33]);  and

- 2-point enhancement for knowingly engaging in distribution,[34] when the guidelines already require a higher base offense level of 22 (rather than 18) for distribution convictions; Hence, adding 2 more levels is double counting.

If Sentencing Commission removed even some of these enhancements for common conduct, the resulting guidelines would be closer to the mandatory minimum in many cases.  For example, computers are ever-present and used for everything.  Also, the speed at which computers can operate and always increasing that nowadays, with a few clicks, thousands of images can be downloaded in a few minutes.  In addition, as stated above, the guidelines already require an enhanced base offense level for distribution convictions.

---

[33] *See* U.S. Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics Guideline Calculation Bases Fiscal Year 2019*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Guideline_Based.pdf
[34] The Final Presentence Report cites U.S.S.G. § 2G2.2(b)(2) for this enhancement.  That subsection does not cover an enhancement for distribution.

**V.    The Requested Sentence Would Avoid Unwarranted Sentencing Disparities.**

As noted above, courts have disagreed with the harshness of the guidelines in non-production child pornography cases and have sentenced defendants at the mandatory minimum. Judges on this Court have sentenced individuals to the mandatory minimum, which was lower than the guideline ranges. *See United States v. Solorzano*, 19-cr-282 (D.D.C.) (defendant pled to distribution of child pornography and was sentenced to 60 months' incarceration for distribution of child pornography where his guidelines were 60-71 months' incarceration); *United States v. Patterson*, 19-cr-355 (defendant sentenced to 60 months' incarceration for distribution of child pornography where his guidelines were 60-71 months); *United States v. Branco*, 09-cr-095 (defendant sentenced to 65 months' incarceration for distributing 46 images to undercover detective); *United States v. Gulley*, 08-cr-273, (Defendant sentenced to 72 months' imprisonment for distribution and possession, where the guideline range was 151 to 188)  I n a case where the offense conduct included more than distribution, the Court sentenced a defendant below the advisory guideline range. *See United States v. Zagorski*, 807 F.3d 291 (D.C. Cir. 2015) (where the guideline ranges were 262-327, above the statutory maximum for the offense, due to the cross-reference under 2G2.2(c)(1), defendant was sentenced to 99 months).

There are cases where defendants actually abused or attempted to abuse children and received sentences lower than the guideline range here:

- *United States v. James Brown*, 12-cr-155 (RJL) (defendant who distributed child pornography and arranged to meet to engage in sexual contact with a 12 year old and who was under investigation for sexual abuse of his grandchildren and was accused of sexual abuse of his own daughter (both of which he conceded the government could prove) sentenced to 144 months)

- *United States v. Harold Reynolds*, 09-cr-117 (JR) (defendant who distributed child pornography and admitted had previously abused and molested his daughter on at least two occasions, sentenced to 121 months)

- *United States v. Gregory Loreng*, 12-cr-132 (JDB) (defendant who possessed and distributed child pornography and had previously abused his adopted sister over multiple years sentenced to 96 months)

- *United States v. Tanner Stickney*, 09-cr-152 (HHK) (defendant filmed himself molesting a 4-year old child and distributed film, sentenced to 15 years).

- *United States v. Lonnie Newhouse*, 12-cr-072 (BAH) (defendant engaged in an online chat and distributed child pornography while on release in a case for repeatedly sexually abusing his stepdaughter, sentenced to 200 months).

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). Ms. Hoppe request that the Court accept the plea agreement. The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing.

**Conclusion**

For the foregoing reasons, and for any other reasons set forth at the sentencing hearing, a

135-month sentence sufficiently addresses Ms. Hoppe's conduct as well as other factors pursuant

to 18 U.S.C. § 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

---

[i] See Exhibit 3 at ECF No. 16, p. 3 of 9; see also Exhibit 3 at 2 (noted March 5, 2013); see also Exhibit 2 at 2 of 22 (Ms. Hoppe has "[r]elapsing-remitting multiple sclerosis"); id. at 10 of 22 (Her condition "has been present for several years and has increased.")

[ii] See id.

[iii] See id.

[iv] See id.

[v] See id.

[vi] See id.

[vii] See id.

[viii] See id.

[ix] See id.

[x] See id.

[xi] See id. at 8-9.

[xii] Lisa Murphy, Thanh Ly, Keana DiMario, Terry Mihowich, and J Paul Fedoroff, *Treatment of Pramipexole-Induced Problematic Sexual Behaviors*, Prim Care Companion CNS Disord 2021;23(0):20br02663, Feb. 18, 2021, available at https://www.psychiatrist.com/pcc/treatment-of-pramipexole-induced-problematic-sexual-behaviors/

[xiii] Per consultation with Dr. Jonathan Lipman, Neuropharmacologist.

[xiv] Kevin J. Klos James H. Bower, Keith A. Josephs, Joseph Y. Matsumoto, and J. Eric Ahlskog, *Pathological hypersexuality predominantly linked to adjuvant dopamine agonist therapy in Parkinson's disease and multiple system atrophy,* Parkinsonism & Related Disorders, Volume 11, Issue 6, September 2005, Pages 381-386 (inner citations omitted), Abstract available at https://www.sciencedirect.com/science/article/abs/pii/S1353802005001331

[xv] *Blake v. United States*, 407 F.2d 908, 916 (5th Cir. 1969), *holding modified by United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984) (emphasis added).

[xvi] *Smith v. United States*, 36 F.2d 548, 549 (D.C. Cir. 1929) (emphasis added).

[xvii] Natalie Jacewicz, *After Hinckley, States Tightened Use Of The Insanity Plea*, July 28, 2016, NPR.org, available at https://www.npr.org/sections/health-shots/2016/07/28/486607183/after-hinckley-states-tightened-use-of-the-insanity-plea.